UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SYNOD OF BISHOPS OF THE RUSSIAN ORTHODOX CHURCH OUTSIDE OF RUSSIA, and THE FUND FOR ASSISTANCE TO THE RUSSIAN ORTHODOX CHURCH OUTSIDE OF RUSSIA,<br><br>                       Plaintiffs,<br><br>   -against-<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>                       Defendant. | Case No. 1:24-cv-01443-NRB<br><br>**SECOND AMENDED COMPLAINT** |

      Plaintiffs Synod of Bishops of the Russian Orthodox Church Outside of Russia (the "Synod") and The Fund For Assistance to the Russian Orthodox Church Outside of Russia (the "Fund") (together, "Plaintiffs"), by their attorneys, Landy Wolf, PLLC, as and for their second amended complaint against defendant JPMorgan Chase Bank, N.A. ("Chase" or "Defendant"), alleges as follows:

### Nature of the Action

    1.    Plaintiffs are the victims of unknown cybercriminals who stole the net sum of $273,288.43 from Plaintiffs in a scheme that would not have succeeded but for the Defendant's negligence and failure to properly review the transactions.

### The Parties

    2.    The Synod is a domestic religious corporation and operates a Russian Orthodox Church located at 1190 Park Avenue, New York, New York.

    3.    The Synod operates in its own name and also operates under the assumed named "Mount of Olives Convent."

    4.    The Fund is a domestic not-for-profit corporation that provides funding to support

1

the spiritual mission of the Russian Orthodox Church Outside of Russia ("ROCOR"), to support ROCOR's clergy, and to provide aid to the needy.

5. Upon information and belief, Defendant is a national banking association with branch locations located nationwide and throughout New York City.

## Jurisdiction and Venue

6. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000 and because there exists a complete diversity of citizenship between the Plaintiffs and the Defendant.

7. This action was initially filed in the Supreme Court of the State of New York, New York County and was removed to federal court by the Defendant. Venue properly lies in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1441(a).

## Background

8. Before the events described in this Complaint, the Plaintiffs each had multiple bank accounts on deposit with Chase (individually identified below and collectively referred to herein as the "Accounts").

9. The Synod had, among other Chase bank accounts, a savings account with an account number ending in 2161 ("Account 2161"), a checking account with an account number ending in 3722 ("Account 3722"), and a checking account with an account number ending in 3300 ("Account 3300").

10. Account 2161 and Account 3722 were held by the Synod in its own name.

11. Account 3300 was held by the Synod under the fictitious name "d/b/a Mount of Olives Convent."

12. The Fund had, among other Chase bank accounts, a savings account with an account number ending in 1568 ("Account 1568") and a savings account with an account number

ending in 2005 ("Account 2005").

13. On August 16, 2023, the Plaintiffs' Communications Director, Nicholas Ohotin ("Ohotin"), was contacted by a person who identified himself as Nevis Resala ("Resala") and who claimed to work in Chase's fraud prevention department.

14. Resala is believed to be an alias, and the true identity of the caller is presently unknown to Plaintiffs.

15. On August 18, 2023, $40,000.00 was transferred from Account 2161 to Account 3300 without the Synod's knowledge or authorization.

16. Thereafter, Ohotin received a phone call from Resala, who asked Ohotin several security questions to verify his identity, and then asked Ohotin whether the transfer was authorized.

17. Ohotin reported that the transfer was not authorized and, as a result, Resala caused the transfer to be reversed.

18. During the telephone call, Ohotin attempted to log in to Synod's bank accounts through Chase's website, but his username and password were not working, and he could not access the Accounts.

19. Resala placed Ohotin on hold, then returned to the call and asked Ohotin to try logging in, at which time Ohotin's online access to the Accounts had been restored.

20. Over the next week, Ohotin was locked out of the Accounts on at least ten occasions and had his access restored by Resala each time.

21. During the same time period, someone with access to the Accounts made unauthorized fund transfers from Accounts 1568, 2005 and 3722 into Account 3300.

22. Resala, still posing as member of Chase's fraud prevention team, convinced Ohotin that, to make the unauthorized fund transfers stop, Ohotin had to send wire transfers from the Accounts to external accounts held by individuals named Lynette Rodriguez and Kennedy Wade,

3

and a business named Elite Distributors, Inc.

23. By the time Resala gave these instructions to Ohotin, Resala had already established his credibility with Ohotin, and led Ohotin to believe that Resala was a Chase employee, by causing several unauthorized transfers to be reversed, by exercising control over Ohotin's online account access in a way that only a Chase employee could do, and by asking security questions that evinced access to the personally identifying information that Chase had on file for Ohotin.

24. Nevertheless, Ohotin remained skeptical of Resala and was reluctant to transfer funds based on Resala's instructions.

25. For that reason, nearly every time Ohotin received a phone call from Resala, he made an in-person visit to one of two nearby Chase bank branches: the Synod's primary branch, located at 181 East 90th Street in Manhattan, and another nearby branch, located at 147 East 86th Street in Manhattan.

26. Ohotin repeatedly explained his concerns to Chase employees in both locations and asked for assistance in responding to the ongoing cyberattack on the Accounts.

27. Ohotin specifically asked multiple Chase employees whether Resala actually worked in Chase's anti-fraud department, and asked whether he, Ohotin, should follow Resala's instructions.

28. On more than one occasion, the Chase employees working in the branches Ohotin visited reviewed Synod's accounts and led Ohotin to believe that the "assistance" he was receiving from Resala was, in fact, being provided by an authorized Chase agent monitoring the Accounts.

29. On one visit to a Chase branch, Ohotin asked a banker to verify Resala's identity and affiliation with Chase. The banker placed a phone call, then returned to Ohotin and confirmed that Ohotin should follow Resala's instructions.

30. Ohotin was initially dubious, but the assurances he received from Chase employees convinced him that Resala was legitimate and, as a result, Ohotin made wire transfers as instructed by Resala.

31. In particular, Ohotin made the following transfers in reliance upon the directions he was given by Resala and the assurances he was given by Chase employees:

- $19,000.00 transfer on August 17, 2023, to an account in the name of Lynette Rodriguez held in Regions Bank in Tyler, Texas;

- $40,000.00 transfer on August 21, 2023, to an account in the name of Lynette Rodriguez held in Regions Bank in Tyler, Texas;

- $70,000.00 transfer on August 23, 2023, to an account in the name of Kennedy Wade held in Regions Bank in Tyler, Texas;

- $70,000.00 transfer on August 24, 2023, to an account in the name of Kennedy Wade held in Regions Bank in Tyler, Texas; and

- $130,000.00 transfer on August 24, 2023 to an account in the name of Elite Distributors, Inc., in East-West Bank in City of Industry, California, with a notation that the transaction was for "Wedding Bands".

32. Plaintiffs would not have made any of the foregoing transactions but for the assurances Ohotin received from Chase employees.

33. Despite the assurances Ohotin received from Chase's employees, Resala was a cybercriminal and conman. Although Resala may have been a Chase employee, as evidenced by his ability to access and control the Accounts and by his knowledge of personal and banking information that could only be gleaned from Chase's records, Resala was working for his own sinister purposes. Plaintiffs reserve the right to hold Chase liable for Resala's theft under a theory of *respondeat superior* if discovery in this action confirms that Resala was, in fact, employed by Chase.

34. In late August 2023, while Ohotin was on an overseas business trip, the Fund's accountant received a phone call from a Chase representative informing him that someone had

walked into a Chase bank branch in Texas, identified himself as Nicholas Ohotin, presented government-issued identification confirming his identity, and attempted to withdraw a $500,000.00 certificate of deposit, or CD, deposited by the Fund.

35. The Fund's accountant directed Chase not to permit the CD to be closed out and, accordingly, Chase refused the impostor's requests.

36. Plaintiffs filed reports with the NYPD and FBI, then blocked Ohotin's online access to Chase accounts.

37. On or about October 31, 2023, Chase sent Plaintiffs a bank check for $55,711.57, apparently representing a portion of the funds that had been stolen from the Plaintiffs.

38. In total, the net sum of $273,288.43 was stolen from the Plaintiffs.

39. Plaintiffs would not have been and could not have been victimized by cybercriminals but for the representations made by Chase, including the assurance that Resala was legitimate when, in fact, Resala was a conman.

## **FIRST CAUSE OF ACTION**
(Negligence)

40. Plaintiffs repeat and reallege the allegations set forth above as though fully set forth at length herein.

41. At all relevant times, Chase was on notice that criminal actors seek to defraud and steal funds from Chase customers such as the Plaintiffs.

42. Bank-related cybercrimes are widespread and common in the banking industry, and therefore foreseeable.

43. It is also foreseeable that the financial harm to victims of cybercriminals would be severe and costly to remedy.

44. For these reasons, among others, Chase had at all relevant times anti-fraud and

6

fraud protection policies and procedures to protect its customers against fraud.

45. Moreover, Chase publicized its anti-fraud and customer protection procedures and regulations. For example, Chase's online marketing materials tout, "Fraud protection all day, every day" to its customers, whose "security is our /number-one priority," and proclaim that Chase maintains "24/7 Fraud Monitoring" and other safeguards to protect its customers from fraud.

46. Chase's CEO has publicly announced that Chase spends over $600 million per year and dedicates over three thousand employees to antifraud and cybersecurity measures, highlighting the "enormous effort and resources we dedicate to protect ourselves and our clients."

47. For these reasons, Plaintiffs trusted Chase to investigate and prevent fraudulent activity in the Accounts.

48. Plaintiffs trusted Chase to verify whether Resala was a Chase employee and whether Ohotin should follow Resala's instructions. After all, Chase was in the best position of anyone to know whether Resala was genuinely employed by Chase.

49. Chase at all times owed a duty of care to Plaintiffs as customers of the bank.

50. Chase violated its duty of care to Plaintiffs by failing to exercise reasonable care, by assuring Plaintiffs that Resala was a Chase employee and by encouraging Plaintiffs to follow Resala's directions, despite having every opportunity and the ability to exercise care to prevent such harm.

51. Chase's breach of its duty of care proximately caused Plaintiffs to be defrauded. But for Chase Bank's flagrant breach of its duty of care, Plaintiffs would not have been victimized by the unknown fraudsters who stole the net sum of $273,288.43 from Plaintiffs.

52. As a direct and proximate result of Chase's breach of duty of care, Plaintiffs have been damaged in an amount to be determined at trial, in an amount not less than $273,288.43, plus interest and attorneys' fees.

## **SECOND CAUSE OF ACTION**
(Negligent Misrepresentation)

53. Plaintiffs repeat and reallege the allegations set forth above as though fully set forth at length herein.

54. Plaintiffs opened the Accounts and deposited funds with Chase, with the reasonable expectation and belief that the Accounts would be protected by Chase's highly-touted fraud detection and prevention departments.

55. As the bank holding Plaintiffs' funds, Chase was bound by a special duty of care to monitor the Accounts and to give correct information to Plaintiffs in matters concerning the safety and protection of the Accounts.

56. Nevertheless, when Ohotin came to Chase, explained that the Accounts were being targeted by scammers, and asked for assistance, Chase's officers assured him that the scammer, Resala, was a legitimate Chase employee.

57. Unbeknownst to Plaintiffs, the information imparted by Chase's officers was incorrect and Resala was, in fact, a conman.

58. Plaintiffs relied to their detriment on the information imparted by Chase's officers because, after all, Chase was in the best position to know whether Resala was a legitimate Chase employee.

59. As a direct and proximate result of Chase's breach of duty of care, Plaintiffs have been damaged in an amount to be determined at trial, in an amount not less than $273,288.43, plus interest and attorneys' fees.

## THIRD CAUSE OF ACTION
(Breach of Contract)

60. Plaintiffs repeat and reallege the allegations set forth above as though fully set forth at length herein.

61. The Accounts, and Plaintiffs' access to the Accounts, are governed by a Deposit Account Agreement (the "DAA"), a Digital Services Agreement ("DSA"), and an Online Wire Transfer and Chase Global Transfer Services Addendum to the Digital Services Agreement (the "Wire Transfer Addendum").

62. In addition, each time the Synod made an in-person wire transfer, it was required to sign a Wire Transfer Agreement (each, a "WTA"), which set forth, among other things, a description of the security procedures Chase agreed to take for each individual wire transfer.

63. Paragraph 2 of each WTA provides that "[a]ll wire transfer requests go through an internal review, and we may need to contact you to verify information about your wire transfer."

64. Paragraph III.B.2 of the Deposit Account Agreement provides that Chase will perform "internal reviews" before processing a wire transfer.

65. The scope of the internal review process is described in the Wire Transfer Addendum. In particular, paragraph 4(d) of the Wire Transfer Addendum provides that "[a]ll scheduled funds transfer requests are subject to an internal review, which includes the recipient, and may not be approved."

66. Furthermore, paragraph 3 of the Wire Transfer Addendum provides that, if Plaintiffs initiates "fund transfer services in person at our branches," then Chase will provide "a higher level of security for your accounts."

67. Paragraph III(A) of the DSA clarifies that Chase has the "discretion" to countermand any transfers initiated by Plaintiffs "for various reasons including fraud," which

9

necessarily means that the parties contemplated that Chase would exercise oversight over the Accounts to combat fraud.

68. Upon information and belief, the basis of which is the affidavits of two Chase employees, the "internal review" performed by Chase was limited to a review of Ohotin's identification and a review of the signature authorization cards on file, to confirm that Ohotin was authorized to enter transactions on Plaintiffs' behalf.

69. The Chase employees who reviewed and approved the in-person wire transfers failed to provide the type of "higher level of security" that Plaintiffs had a right to expect in connection with in-person fund transfers and, upon information and belief, failed to conduct any review of the identity of the wire recipients.

70. The foregoing constitutes a breach of contract by Chase.

71. As a direct and proximate result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, in an amount not less than $273,288.43, plus interest and attorneys' fees.

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

(a) On the First Cause of Action, awarding Plaintiffs a money judgment against the Defendant in the amount of $273,288.43, plus interest, costs and attorneys' fees;

(b) On the Second Cause of Action, awarding Plaintiffs a money judgment against the Defendant in the amount of $273,288.43, plus interest, costs and attorneys' fees;

(c) On the Third Cause of Action, awarding Plaintiffs a money judgment against the Defendant in the amount of $273,288.43, plus interest, costs and attorneys' fees; and

    (d)    Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated: New York, New York  
       November 11, 2024

LANDY WOLF, PLLC

_____  
David A. Wolf  
Steven Landy  
*Attorneys for Plaintiffs*  
270 Madison Avenue, Suite 1801  
New York, New York 10016  
Tel. (212) 682-8510  
dwolf@landywolf.com