UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
SYNOD OF BISHOPS OF THE RUSSIAN
ORTHODOX CHURCH OUTSIDE OF RUSSIA,
and THE FUND FOR ASSISTANCE TO THE
RUSSIAN ORTHODOX CHURCH OUTSIDE
OF RUSSIA,

                Plaintiffs,

         - against -

JPMORGAN CHASE BANK, N.A.,

                Defendant.
-----------------------------------X

**MEMORANDUM AND ORDER**

24 Civ. 1443 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

In their Second Amended Complaint, plaintiffs Synod of Bishops of the Russian Orthodox Church Outside of Russia (the "Synod") and the Fund for Assistance to the Russian Orthodox Church Outside of Russia (the "Fund") (together, "plaintiffs"), bring claims of negligence, negligent misrepresentation, and breach of contract against defendant JP Morgan Chase Bank, N.A. ("Chase"), after nearly $330,000 was transferred out of plaintiffs' Chase bank accounts. ECF No. 27 ("SAC"). Chase moved to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. ECF No. 30. For the following reasons, we grant the motion and dismiss plaintiffs' SAC with prejudice.

**BACKGROUND**

**A. Relevant Facts[1]**

Plaintiffs are two entities, the Synod, a domestic religious corporation that operates a Russian Orthodox Church on Manhattan's Upper East Side, SAC ¶ 3, and the Fund, a domestic non-profit that provides funding to support the "spiritual mission of the Russian Orthodox Church Outside of Russia," id. ¶ 4. Defendant Chase is a national bank. Id. ¶ 5.

By way of background, plaintiffs maintain at least five bank accounts with Chase. Id. ¶¶ 8-12. For at least three of these accounts, plaintiffs' communications director, Nicholas Ohotin ("Ohotin"), was a signatory and thus had the authority to deposit, withdraw, and transfer funds from those accounts. ECF No. 31 ("Simson Decl.") at Exs. A–C. Plaintiffs allege that one of plaintiffs' agents, who was an authorized signatory on some of plaintiffs' Chase bank accounts, was fraudulently induced by a third party to authorize several external wire transfers amounting to nearly $330,000. ECF No. 36 ("Pl.'s Br.") at 1. Plaintiffs' claims are not brought against the alleged fraudulent inducer, but

---

[1]    Unless otherwise noted, the facts considered and recited herein are drawn from plaintiff's Second Amended Complaint and accepted as true, making all reasonable inferences in plaintiff's favor. See McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995).

instead are directed at Chase, which plaintiffs claim negligently permitted plaintiffs to be "victimized by the unknown fraudsters." SAC ¶¶ 1, 39, 51.

On August 16, 2023, Ohotin was allegedly contacted, out of the blue, by a person identifying himself as "Nevis Resala" ("Resala") -- which plaintiffs now believe to be an alias[2] -- who purported to work for Chase's fraud prevention department.  Id. ¶ 13.  It is unclear what Ohotin and Resala discussed during this initial call but, two days later, an unauthorized transfer of $40,000 was made between two of plaintiffs' Chase accounts.  Id. ¶ 15.  Shortly thereafter, Ohotin received another call from Resala, who asked whether this $40,000 transfer was intentional and authorized.  Id. ¶ 16.  Ohotin indicated that it was not.  Id. Resala then reversed the transfer.  Id. ¶ 17.

This was just the beginning of a series of suspicious events surrounding plaintiffs' Chase accounts.  For example, Ohotin's access to plaintiffs' online banking portal was locked on at least ten occasions, which precluded him from reviewing account balances or transferring money.  Id. ¶ 18.  In each of the ten instances, Ohotin affirmatively called Resala directly -- rather than Chase's

---

[2]    Plaintiffs have still not been able to verify this individual's "true identity."  SAC ¶ 14.

dedicated customer service hotline -- and Resala was able to restore Ohotin's account access.  Id. ¶ 20.

Plaintiffs' account-related problems continued, coming to a head when "someone with access to" plaintiffs' accounts made several "unauthorized" internal transfers between plaintiffs' Chase accounts.  Id. ¶ 21.  Ohotin again sought assistance directly from Resala, who "convinced Ohotin that, to make the unauthorized fund transfers stop, Ohotin had to send wire transfers from [plaintiffs'] [a]ccounts to [three specific] external accounts held by" two individuals and one business.  Id. ¶ 22.

While Ohotin felt that Resala was "credibl[e]," since he had helped rectify each of Ohotin's prior account troubles, Ohotin was nevertheless skeptical of Resala's latest directive.  Id. ¶¶ 23-24.  Accordingly, Ohotin temporarily held off on making the external transfers.  In the meantime, however, Ohotin received several follow-up calls from Resala regarding the status of the transfers.  Id. ¶ 25.  As alleged by plaintiffs, "nearly every time" Resala called, Ohotin "made an in-person visit to one of two nearby Chase bank branches."  Id.  Ohotin sought the assistance of the in-branch Chase employees to "explain[] his concerns" about Resala's instructions and confirm "whether Resala actually worked in Chase's anti-fraud department."  Id. ¶¶ 26-27.  These in-branch

employees apparently "led Ohotin to believe that the 'assistance'
he was receiving from Resala was, in fact, being provided by an
authorized Chase agent monitoring [plaintiffs] accounts." Id. ¶
28. Specifically, plaintiffs allege that during "one visit to a
Chase branch, Ohotin asked a [']banker['] to verify Resala's
identity and affiliation with Chase," and, after the "banker"
placed "a phone call," he "returned to Ohotin and confirmed that
Ohotin should follow Resala's instructions." Id. ¶ 29 (alterations
added). With these "assurances," Ohotin became "convinced" that
Resala "was legitimate." Id. ¶ 30. He then "made the wire
transfers as instructed by Resala." Id.

In total, Ohotin made five transfers from plaintiffs'
accounts, totaling nearly $330,000. Id. ¶ 31. The recipients
were two individuals and one company, and the transfers included:
(A) two transfers, on different days, totaling nearly $60,000, to
"Lynette Rodriguez" in Texas; (B) two transfers, on different days,
totaling $140,000, to "Kennedy Wade," also in Texas; and (C) one
transfer of $130,000 to "Elite Distributors, Inc.," based in
California. Id. For reasons apparently unknown to (and
unquestioned by) Ohotin, Resala instructed Ohotin to include a
specific memo on the transfer to Elite Distributors indicating
that the payment was for "Wedding Bands." Id. Further unexplained

-5-

is why, exactly, Ohotin thought that wiring these funds -- to these particular recipients, in these specific denominations, and with these unique descriptions -- would rectify plaintiffs' account troubles.

Shortly after the funds were transferred, the Fund's accountant -- not Ohotin -- was alerted by a Chase representative that someone purporting to be "Nicholas Ohotin" was at a Chase branch in Texas attempting to withdraw nearly half-a-million dollars from plaintiffs' accounts. Id. ¶ 34. At that point, plaintiffs realized that their accounts had been compromised, and plaintiffs contacted the NYPD and FBI and blocked Ohotin's account access. Id. ¶¶ 34-36. Following this incident, Chase conducted an internal investigation and recovered about $56,000 for plaintiffs. Id. ¶ 37.

Against this factual backdrop, plaintiffs bring the instant lawsuit, alleging that Ohotin was duped into making these transfers by "Resala," a "cybercriminal and conman," and that Ohotin would not have made the external transfers "but for the representations made by Chase." Id. ¶¶ 32, 39.

**B.    Procedural History**

A detailed review of the procedural history of this case is important to our analysis. This case was originally filed on

January 16, 2024, in New York Supreme Court.  ECF No. 1, Ex. A.
In their original complaint, plaintiffs raised several common law
claims, alleging that Chase employees were negligent in failing to
verify Resala's legitimacy when Ohotin visited the local Chase
branches, and that Chase breached its customer contracts by
transferring the funds "without authorization."  Compl. ¶¶ 30, 34–
40, 60-71.  On February 26, 2024, defendant removed the action
pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.  ECF No. 1.  On
March 18, 2024, defendant filed a pre-motion letter seeking leave
to dismiss the complaint, arguing that "Article 4A of the NYUCC
preempts Plaintiffs'" common law claims and, in addition, that
plaintiffs' complaint failed to state a claim.  ECF No. 9.

In response, plaintiffs withdrew the original complaint, ECF
No. 10, and filed a First Amended Complaint ("FAC") on April 22,
2024, ECF No. 13, 14.  The FAC contained only one cause of action,
which was premised on the provisions of Article 4-A of the New
York Uniform Commercial Code ("NYUCC"), which addresses
unauthorized wire transfers.  FAC ¶¶ 67-78.  Chase responded to
the FAC with another pre-motion letter, seeking leave to dismiss
on the basis that the transfers were authorized by Ohotin, a valid
account signatory, and thus did not contravene Article 4-A.  ECF
No. 15.  Specifically, defendant attached to its pre-motion letter

various bank records confirming that the transfers were made in person upon the express approval of Ohotan, whose identity and signatory status were verified by a Chase employee. See id. at Exs. 1-4. The Court reviewed defendant's pre-motion letter, ECF No. 15, and plaintiffs' response, ECF No. 16, and scheduled a conference, which was held on June 13, 2024. During the conference, it was agreed that: (i) defendant would "withdraw the motion to dismiss request . . . without prejudice to renew [its] arguments at a later time;" see ECF No. 17 at 6:17-18; (ii) defendant would file an answer; see id. at 6:19; and (iii) the parties would conduct initial discovery to explore "the threshold . . . inquiry," namely, whether the transfers were "authorized;" id. at 7:10-14.

Defendant answered the First Amended Complaint on July 11, 2024, ECF No. 19, and filed a status update letter on October 18, 2024, reporting that it had shared with plaintiffs' various business records and declarations from Chase employees indicating that the wire transfers were "authorized by Plaintiffs' representative Mr. Ohotin," ECF No. 20 at 2. Defendant indicated that, after it provided these documents to plaintiffs on July 12, 2024, plaintiffs' counsel, on July 26, 2024, expressed an intention to move for leave to amend the complaint. Id. Defendant's status

letter went on to highlight that plaintiffs' counsel had taken no further action with respect to amending the complaint in nearly three months, emphasizing that plaintiffs were "refus[ing] to meaningfully move this case forward into discovery." Id.    In response, plaintiffs filed a letter that same day seeking leave to amend the complaint, ECF No. 21, which defendant opposed, ECF No. 22.

The Court held another conference on November 7, 2024, and it was decided that (i) plaintiffs would be given an additional opportunity to amend and (ii) defendant would be given leave to move to dismiss the SAC.    On November 11, 2024, plaintiffs filed the SAC, which replaced the FAC's NYUCC claim with common law claims for negligence and breach of contract.    ECF No. 27. Defendant's motion to dismiss was filed on December 20, 2024.    ECF No. 30.    Plaintiffs filed their opposition papers on February 6, 2025, ECF No. 36, and the motion was fully briefed following defendant's reply on February 25, 2025, ECF No. 38.

<u>**DISCUSSION**</u>

**A.    Legal Standard**

On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.    See Ashcroft

v. Iqbal, 556 U.S. 662, 678 (2009).  Nonetheless, "[f]actual allegations must be enough to raise a right of relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citation omitted).  Ultimately, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." Id. at 570.  If a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." Id.

## B.  Application

Plaintiffs' latest complaint no longer contains any cause of action under the NYUCC but instead alleges three common law claims: negligence, negligent misrepresentation, and breach of contract.

### 1. Negligence and Negligent Misrepresentation Claims[3]

Plaintiffs seek to advance claims for both negligence and negligent misrepresentation.  However, when such claims are pled

---

[3]    Chase's briefing raises -- but does not fully develop -- the argument that plaintiffs' common law claims for negligence, negligent misrepresentation, and breach of contract are preempted by the New York Uniform Commercial Code ("NYUCC").  See ECF No. 32 at 20-22 and ECF No. 38 at 6-7 ("Def's Br." and "Def's Reply," respectively).  The five paragraphs in total across all the briefing on preemption are insufficient for us to -- as we typically would -- perform a fulsome analysis on this threshold issue.  Nevertheless, we offer our initial view that plaintiffs' three common law claims are likely preempted by the NYUCC.

Article 4-A is intended to be the "exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article." Fischer & Mandell LLP v. Citibank,

together, courts in this Circuit frequently either dismiss one of the two claims or collapse the negligent misrepresentation claim into a basic negligence claim.  See Paladini v. Capossela, Cohen, LLC, No. 11 Civ. 2252, 2012 WL 3834655, at *6 (S.D.N.Y. Aug. 15, 2012) (dismissing a negligent misrepresentation claim as duplicative of a negligence claim based upon the same insufficiently pled allegations and injuries), aff'd, 515 Fed. Appx. 63 (2d Cir.2013); Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Oregon, Inc., 156 F. Supp. 3d 348, 362-63 (E.D.N.Y. 2016) (dismissing negligence claim as "nearly identical" to unsupported negligent misrepresentation claim and collecting cases holding the same).  This is especially true where, as here, the two claims are "identical in substance," albeit not "identical

---

N.A., 632 F.3d 793, 801 (2d Cir. 2011).  There is a provision of the NYUCC directly applicable to this case, namely Section 4-A-302, which sets out the "obligations of receiving bank[s] in execution of [a] payment order."  See NYUCC 4-A-302.  Plaintiffs' common law claims are thus likely preempted here by the NYUCC given that such claims "cover the same territory as Article 4-A" and are based on the same "predicate[]" conduct, namely, a bank's responsibility to investigate, prevent, monitor, and detect fraud in wire transfers.  See 123RF LLC v. HSBC Bank USA, N.A., 663 F. Supp. 3d 391, 401 (S.D.N.Y. 2023), appeal withdrawn, No. 23-625, 2023 WL 7117444 (2d Cir. May 22, 2023).

    We would also be remiss if we failed to reiterate that plaintiffs' original complaint contained a common law negligence claim, which plaintiffs withdrew when they amended that complaint, replacing it instead with a sole claim under Article 4-A.  See supra at 6-9.  This change in pleading followed defendant's pre-motion letter to dismiss the original complaint, emphasizing that plaintiffs' common law claim was preempted by the NYUCC.  See ECF No. 9.  Replacing their negligence claim with an NYUCC-based claim -- in response to defendant's anticipated argument in support of dismissal -- can be perceived as an acknowledgement by plaintiffs that the preemption argument may very well be meritorious.  Of course, plaintiffs' third complaint reversed course yet again.

word-for-word." Phoenix Companies, Inc. v. Concentrix Ins. Admin. Sols. Corp., 554 F. Supp. 3d 568, 604 (S.D.N.Y. 2021).  Thus, at the outset, we note that plaintiffs' duplicative pleading serves as a sufficient basis to dismiss the negligent misrepresentation claim outright or collapse it into plaintiffs' negligence claim.

However, in the interest of completeness, we nevertheless analyze plaintiffs' negligence and negligent misrepresentation claims separately, starting with the former.

a. Plaintiffs' Complaint Fails to State a Negligence Claim

"To establish a prima facie case of negligence under New York law, 'a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom.'"  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 286 (2d Cir. 2006) (quoting Solomon ex rel. Solomon v. City of New York, 66 N.Y.2d 1026, 1027, 489 N.E.2d 1294, 1294 (1985)).  As mentioned earlier, see supra at 2-3, plaintiffs' third complaint generally asserts that defendant was negligent in allegedly assuring Ohotin "that the 'assistance' he was receiving from Resala was, in fact, being provided by an authorized Chase agent monitoring the Accounts," and that "Resala's instructions . . . should [be] follow[ed]."  SAC ¶¶ 27-31.  In addition, plaintiffs suggest that Chase breached a duty of care by failing

to investigate and halt the wire transfers, especially in light of the bank's commitment -- conveyed in its marketing materials -- to protect customers from fraud.  Id. ¶¶ 44-46.

This pleading is insufficient to survive a motion to dismiss.  Plaintiffs' allegations about the alleged "assur[ances]" about Resala given to Ohotin by Chase employees, see id. ¶ 56, are particularly thin.  Plaintiffs do not offer even the most basic details about (i) when and where these alleged interactions occurred; (ii) the names or descriptions of the Chase employees with whom Ohotin spoke; and (iii) most importantly, what specifically was said by and to Ohotin that led him to feel "assured" by Chase's employees.  Plaintiffs' omission of basic information such as this deprives Chase of the notice to which it is entitled to be able to defend itself in this action.  Gindi v. Bennett, No. 15 Civ. 6475 (RRM) (MDG), 2016 WL 1452383, at *1 (E.D.N.Y. Apr. 13, 2016) (when "it is difficult, if not impossible, to discern the nature of the claims against" the defendants, the complaint must be dismissed because a plaintiff "must provide facts sufficient to allow each defendant to have a fair understanding of what she is complaining of and whether there is a legal basis for recovery"); see also Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir. 1995) ("'Fair notice is that which will enable the adverse party

-13-

to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.'") (quoting 2A Moore's Federal Practice ¶ 8.13, at 8–58 (2d ed. 1994).

Plaintiffs seem to reject the well-established pleading rules and instead suggest that defendant is being "truly nitpicky" by demanding specific facts about the events at issue. Pl.'s Br. at 9. Plaintiffs even go so far as to suggest that defendant is holding plaintiffs to too high a standard under some "novel proposition that Plaintiffs are required to make . . . detailed and particularized allegations" in a complaint. Id. at 8. Plaintiffs' claim that they are being held to too demanding a standard is particularly misplaced since plaintiffs have full access to their agent, Ohotin, and because plaintiffs received discovery from Chase after filing the second complaint. Nor is this a situation where the bank acted on its own in making the transfers. Rather, each transfer was expressly approved by Ohotin, an authorized signatory whose credentials were verified by the bank. Thus, "without some further factual enhancement," plaintiffs' complaint "stops short of the line between possibility and plausibility of entitle[ment] to relief." Twombly, 550 U.S. at 557 (marks and citations omitted).

-14-

Moreover, even if, _arguendo_, we were to ignore the factual deficiencies of plaintiffs' pleading, we also observe that basic common sense and the doctrine of reasonable reliance undercut the viability of plaintiffs' liability theory.  Ohotin's actions, as pled -- including his repeated affirmative contact with Resala and his willingness to trust this unknown person and transfer hundreds of thousands of dollars of the Russian Orthodox Church to accounts owned by arbitrary individuals, not to mention a seemingly nonsensical and unexplained payment to an unknown corporate entity for "wedding bands" -- are patently unreasonable and suspect.

The degree of plaintiffs' agent's unreasonableness -- the clear elephant in the room -- has a substantive consequence here given that plaintiffs' negligence claim is based on the alleged representations of another.  In such a circumstance, plaintiff must show that "reliance" on those representations was "reasonable."  L. Offs. of Oliver Zhou v. Citibank N.A., No. 15 Civ. 5266 (ER), 2016 WL 2889060, at *6 (S.D.N.Y. May 17, 2016). Here, plaintiffs' failure to make such a showing provides a separate basis for dismissal.  See id. ("New York courts have found that" it is "unreasonable as a matter of law" for a plaintiff to effectuate a wire transfer in reliance on "alleged oral statements" that are merely "ambiguous remark[s]."); see also Iqbal, 556 U.S.

at 679 ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.").

Aside from the patent unreasonableness of Ohotin's conduct, plaintiffs' negligence claim also fails due to an inability to causally connect Chase's alleged assurances to the wires Ohotin authorized.  As mentioned above, a negligence claim requires a plaintiff's "injury [to] proximately result[]" from the alleged duty breach.  Lerner, 459 F.3d at 286.  Thus, even if we assume, arguendo, that Chase breached some duty to Ohotin by allegedly assuring him "that the 'assistance' he was receiving from Resala was . . . being provided by an authorized Chase agent," SAC ¶¶ 28-31, it is unreasonable to perceive any such assurance as the proximate cause of the wire transfers Ohotin initiated days later.  For example, it is not as if the in-branch Chase employees told Ohotin that making various wire transfers to two individuals and one business entity in other states was a reasonable way to resolve his account-related problems.  Here, there was clearly another causal factor, namely, Resala's specific instruction to make the wire transfers.  Id. ¶ 22.  Thus, the Chase employees' alleged assurances are too attenuated from plaintiffs' injury to satisfy the causal component of the negligence standard.  See Higazy v. Templeton, 505 F.3d 161, 181 (2d Cir. 2007) (noting that but-for

-16-

causation is insufficient to establish liability where an unforeseen, intervening act breaks the chain of causation); see also Lapidus v. State, 57 A.D.3d 83, 866 N.Y.S.2d 711, 721 (N.Y.App.Div.2008) (defining an "intervening act" as "a new and independent force, which was not set in motion by the defendant's own wrongful acts") (citation omitted).  Stated another way, Ohotin's wire transfers are "too remote" a consequence "from the original tortious act," here, Chase's alleged assurances about Resala's identity, "to permit liability."  Zahrey v. City of New York, No. 98 Civ. 4546 (DCP) (JCF), 2009 WL 1024261, at *3 (S.D.N.Y. Apr. 15, 2009) (citing Wray v. City of New York, 490 F.3d 189, 193-95 (2d Cir. 2007)).

For these reasons, plaintiffs' negligence claim fails.

b. Negligent Misrepresentation Claim

As discussed above, see supra at 10-12, because of plaintiffs' duplicative pleading, we need not separately analyze plaintiffs' negligent misrepresentation claim.  However, we do so to offer a complete analysis for plaintiffs.

"Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she

-17-

should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." Hydro Invs., Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000); Eiseman v. State of New York, 70 N.Y.2d 175, 187, 511 N.E.2d 1128 (1987).

Accordingly, under this standard, plaintiffs must first establish that there was a "special relationship" between the tortfeasor bank and plaintiffs. Common examples of these "special relationships" include the "master-servant, parent-child, and common carrier-passenger relationships." Rivera v. New York City Health & Hosps. Corp., 191 F. Supp. 2d 412, 417 (S.D.N.Y. 2002) (citing Restatement (Second) of Torts § 315). By contrast, courts have typically declined to find a "special relationship" between a bank and an account-holder. See Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank, 57 F.3d 146, 158 (2d Cir. 1995) (highlighting the general rule that "banking relationships are not viewed as special relationships giving rise to a heightened duty of care"); see also JPMorgan Chase Bank, N.A. v. Freyberg, 171 F. Supp. 3d 178, 191 (S.D.N.Y. 2016) ("The relationship between a bank and its depositor is that of debtor

and creditor, which, without more, is not a fiduciary or special relationship.") (citation omitted). In light of this, courts applying New York law have found that the bank-customer relationship "does not support a cause of action for negligent misrepresentation . . . even if there is a long-standing relationship between the customer and a particular bank employee or if the parties are familiar or friendly." Greenberg, Trager & Herbst, LLP v. HSBC Bank USA, 17 N.Y.3d 565, 578, 958 N.E.2d 77, 84 (2011) (citations omitted).

Despite the strong case law undercutting their position, plaintiffs nevertheless persist, noting that some courts in this Circuit have allowed negligent misrepresentation claims to proceed even without a traditional special relationship. Pls. Br. at 10. Plaintiffs suggest that, in such circumstances, "the speaker had unique knowledge and provided information knowing how that information would be used by the plaintiff," thereby justifying an elevated duty. Id. (citing Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 188 (2d Cir. 2004)). This argument is misplaced. For example, in Eternity Global, the court noted that it was not necessarily "fatal" to a negligent misrepresentation claim if "a 'special relationship' [wa]s nowhere pled," so long as there was other evidence

-19-

indicative of some unique or specialized dynamic between the parties. 375 F.3d at 188. Here, however, we have the inverse situation, where a "special relationship" is pled but wholly unsupported by both fact and law. Simply adding the adjective "special" to plaintiffs' pleading does not convert plaintiffs' otherwise standard relationship with Chase into a "special" one. Further, not only is there no special relationship or correspondingly heightened duty owed to plaintiffs by Chase, but we note that the relationship between a bank and a customer is, as discussed below, <u>see</u> <u>infra</u> at 21-24, largely dictated by contract; Chase's customer contracts provide for no such heightened duty of care.

The absence of any special relationship between Chase and plaintiffs is sufficient to reject plaintiffs' negligent misrepresentation claim. This issue aside, plaintiffs' claim would still fail, as the other elements of the negligent misrepresentation standard are inadequately pled.[4]

---

[4] For example, plaintiffs offer no specific evidence upon which we could conclude that Chase's alleged assurances to Ohotin constitute "false representation[s]," which are required to establish the second element of a negligent misrepresentation claim. <u>Hydro Invs., Inc.</u>, 227 F.3d at 20. Moreover, and as discussed above, <u>see</u> <u>supra</u> at 15-17, there is no basis upon which we could perceive Ohotin's actions as constituting "reasonable reli[ance]," and thus the fifth element of the standard is not met. <u>Id.</u>

## 2. <u>Breach of Contract Claim</u>

Plaintiffs also assert a breach of contract claim against defendant, broadly alleging that Chase failed to properly review, verify, and investigate the at-issue transactions as required under their customer contracts. SAC ¶¶ 60-71. In New York, a plaintiff can survive the motion to dismiss stage on a breach of contract claim if the plaintiff has sufficiently alleged: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." <u>Harsco v. Segui</u>, 91 F.3d 337, 348 (2d Cir. 1996). For the purposes of this analysis, we focus our attention on the third element, <u>i.e.</u>, breach.[5]

In short, plaintiffs' contract claim fails on the merits, for there is no indication that Chase failed to comply with its contractual obligations to plaintiffs. For example, plaintiffs assert that Chase breached its customer contracts by failing "to provide the type of 'higher level of security' that [p]laintiffs had a right to expect in connection with in-person fund transfers and, upon information and belief, failed to conduct any review of the identity of the wire recipients." SAC ¶ 69. For one, the

---

[5]    In satisfaction of element one, plaintiffs maintained contracts with Chase, which set the terms, conditions, and obligations for the parties' as it relates to deposit accounts and digital banking services, SAC ¶ 61; <u>see also</u> Simson Decl., Exs. I-K, Digital Services Agreement.

-21-

"higher level of security" language plaintiffs invoke is found in the parties' Digital Services Agreement, which governs online wire transfers, not the type of in-person transfers Ohotin made here. This issue aside, all indications in the record are that Chase's performance was entirely consistent with its contractual obligations. Under Chase's customer contracts, before Chase can discharge a customer's funds via wire, a Chase employee must first verify the transferor's identity with a valid physical ID and confirm that the transferor's signature matches the signature on file. See Simon's Decl. at Exs. G ¶ 2(a) & H ¶ 2(a).[6] By all accounts, this is exactly what occurred when Ohotin initiated the external transfers: an in-branch Chase employee verified Ohotin's identity and his signature, which was present on each of the five transfers. See SAC ¶ 68. Thus, by plaintiffs' own pleadings, defendant fulfilled its contractual obligations.

Additionally, plaintiffs appear to fault defendant for "fail[ing] to conduct any review of the identity of the wire recipients." SAC ¶ 69. However, plaintiffs cite no authority suggesting that a bank that receives a wire request from an

---

[6]     The Court may consider the customer contracts introduced via declaration because "[w]hen presented with a motion to dismiss . . . the Court may consider documents that are referenced in the complaint," and "relied on" by plaintiffs "in bringing suit." Lee-Walker v. N.Y.C. Dep't of Educ., 220 F. Supp. 3d 484, 487 (S.D.N.Y. 2016), aff'd sub nom. Lee-Walker v. New York City Dep't of Educ., 712 F. App'x 43 (2d Cir. 2017).

authorized account signatory has an affirmative obligation to investigate and/or verify the ultimate recipient(s) of the wire transfer.  In fact, defendant's briefing references the NYUCC, which appears to suggest that the opposite might be the case: "If a receiving bank fails to execute a payment order it was obliged by express agreement to execute, the receiving bank is liable to the sender for its expenses in the transaction and for incidental expenses and interest losses resulting from the failure to execute."  See NYUCC § 4-A-305(4).  Thus, it could very well be that Chase could have been held liable on other grounds if it had delayed or canceled the wire transfer against Ohotin's express wishes.

Additionally, with respect to Chase's contractual duty to conduct an "internal review" before processing a wire transfer, while plaintiffs suggest Chase failed to undertake such a review, SAC ¶¶ 68, 69, the record demonstrates otherwise.  As previously mentioned, the in-branch employee first verified Ohotin's identity and signature, and, once the "Wire Transfer Form" was signed, it appears that Chase followed its standard wire transfer protocol by placing the executed form in the "approval queue where a second Chase branch employee reviews the wire and approves if appropriate."  Simson Decl. at Ex. L ¶¶ 5-6, Ex. M ¶ 6.  The

-23-

identity and signature verification, plus the two-step approval process, is consistent with an appropriate "internal review," thereby negating any claim of breach.  See Beck v. Metro. Bank Holding Corp., 747 F. Supp. 3d 442, 460 (E.D.N.Y. 2024) ("Indeed, the fact that both [wire transfer] Agreements reflect that one Chase employee initiated each wire transfer while a different Chase employee approved each wire transfer suggests that Chase did in fact comply with [its customer contract] by conducting an internal review.").

There are thus several sufficient and independent bases upon which plaintiffs' contract claim fails.

**CONCLUSION**

For the foregoing reasons, the Court grants defendant's motion in full and therefore dismisses plaintiffs' Second Amended Complaint with prejudice.  The Clerk of Court is respectfully requested to terminate the motion pending at ECF No. 30 and close this case.


**SO ORDERED.**

Dated:    August 14, 2025
          New York, New York

                                    _____
                                      NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE